IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Criminal Case No. 20-cr-00021-PAB-2

UNITED STATES OF AMERICA,

      Plaintiff,

v.

2. DEVAN HARRIS,

      Defendant.
_____

**ORDER**
_____

      This matter is before the Court on the Government's Motion in Limine to Exclude Testimony of Dr. Jesse De La Cruz [Docket No. 110], Defendant's Motion in Limine Regarding Government's Proposed Expert Amy Kelley [Docket No. 111], and the Government's Motion in Limine to Exclude Enhanced Defense Videos at Trial [Docket No. 112]. The parties have responded to the motions. Docket Nos. 123, 122, and 124, respectively.

**I. DOCKET NO. 110**

      The government seeks to exclude the proposed testimony of Dr. Jesse De La Cruz, one of Mr. Harris's experts, pursuant to Federal Rules of Evidence 401, 702, 703, 704(b), and 801. Docket No. 110 at 1. Mr. Harris states in his disclosure that Dr. De La Cruz will testify that the victims[1] "are/were both members of the Aryan Brotherhood," the

_____

[1] The Court will use the term "victims" as a shorthand way to refer to Steven Hicklin and Roy Martin, who are the persons Mr. Harris and co-defendant Jesse Wilson allegedly assaulted as charged in Count One through Six of the indictment. The parties

1

victims' actions immediately preceding the attack were consistent with Aryan Brotherhood "security protocol" to "avoid attacks by other individuals and to ensure that the attacks they commit are successful," Docket No. 104 at 9, and will "explain[] in detail what transpired before and during the incident as shown in the video." *Id.* at 10–11.[2]

The government argues that, because "video and discovery reveal[] no colorable claim of self-defense," and do not show that the attack was "gang-related," Dr. De La Cruz's testimony has no relevance to the case. Moreover, the government argues that, because Rule 704(b) bars testimony about a defendant's mental state, Dr. De La Cruz may not testify as to the mental states of Mr. Harris or the victims. Docket No. 110 at 2–3. Finally, the government argues that Dr. De La Cruz's proposed testimony about the victims' gang affiliation is inadmissible hearsay and he is not qualified to opine about the Aryan Brotherhood. *Id.* at 3. Mr. Harris opposes the motion. *See generally* Docket No. 123.

## A.  Testimony that Mr. Harris Acted in Self-Defense

The government first argues that Dr. De La Cruz cannot "narrate the events on the video, and he cannot opine as to the mental state of anyone shown in the video." Docket No. 110 at 5. The government seeks to bar Dr. De La Cruz from testifying that Mr. Harris "believed he acted in self-defense" because there is "no indication that the defendant has a valid affirmative self-defense claim." *Id.* at 6.

---

have similarly used this convention. *See, e.g.*, Docket No. 110 at 3; Docket No. 123 at 9.

[2] The government will introduce two videos that depict slightly different angles of what appears to be the common area of the pod. The videos show large portions of the alleged assaults.

The Court will not permit Dr. De La Cruz to "narrate" or interpret for the jury what is taking place on the prison's videos.[3]  Mr. Harris has provided no indication that Dr. De La Cruz has experience or expertise involving the portion of the facility where the attack took place or that he has learned information from Mr. Harris, Mr. Wilson, or the victims to inform his opinions regarding the videos.  Nor has Mr. Harris shown that Dr. De La Cruz has any special knowledge or expertise about the events shown in the videos.

The Court will also not permit Dr. De La Cruz to testify about the mental states of anyone depicted in the videos, including opinions that Mr. Harris believed that he was acting in self-defense or that he was entitled to resort to self-defense.[4]  First, Federal Rule of Evidence 704(b) prohibits an expert from testifying that a defendant did or did not have a "mental state or condition that constitutes an element of the crime charged or of a defense."  Second, the Tenth Circuit has explained that, "[u]nder federal law, '[a] person may resort to self-defense if he reasonably believes that he is in imminent danger of death or great bodily harm, thus necessitating an in-kind response.'"  *United States v. Rico*, 3 F.4th 1236, 1239 (10th Cir. 2021) (quoting *United States v. Toledo*, 739 F.3d 562, 567 (10th Cir. 2014) (citations omitted)).  The disclosure regarding Dr. De La Cruz provides no basis for Dr. De La Cruz to opine that either Mr. Harris or Mr. Wilson reasonably believed that he was in imminent danger.  The disclosure regarding

---

[3] Mr. Harris "agrees that Dr. De La Cruz may not merely narrate the contents of the surveillance video."  *See* Docket No. 123 at 8.

[4] Mr. Harris acknowledges that his disclosure regarding Dr. De La Cruz's opinions does not "propose that Dr. De La Cruz testify about the mental states of any individual."  *See* Docket No. 123 at 8.

Dr. De La Cruz does not state that he spoke with either Mr. Harris or Mr. Wilson.  To the extent that the videos could be interpreted to cause a juror to believe that Mr. Harris "reasonably believe[d] that he [wa]s in imminent danger of death or great bodily harm," *see id.*, the disclosure indicates no expertise possessed by Dr. De La Cruz that would provide a proper foundation for such an opinion.  Thus, Dr. De La Cruz may not testify, based on the videos, that Mr. Harris was acting in self-defense or that Mr. Harris believed himself to be in imminent danger.

### B.  Testimony that the Victims Are or Were Members of the Aryan Brotherhood

The government seeks to bar Dr. De La Cruz from testifying that the victims are or were members of the Aryan Brotherhood.  Docket No. 110 at 6–8.  The government states that Dr. De La Cruz has no personal knowledge of the victims and has never spoken to them or anyone who knows them.  *Id.* at 7.  Mr. Harris does not dispute that fact.  As the Court noted at the January 13, 2022 motions hearing, however, the victims' Aryan Brotherhood membership is not in dispute and is a fact that appears in discovery. *See also* Docket No. 104 at 9 (listing facts from discovery showing that the victims are or were Aryan Brotherhood members).  An expert's testimony is not limited to facts about which the expert has personal knowledge.  Rather, Rule 703 permits an expert to testify based on "facts or data in the case that the expert has been made aware of." Additionally, experts may inform their opinions with information that experts in that field commonly rely upon.  *See* Fed. R. Evid. 703 (noting that, if experts in a particular field "would reasonably rely on" a particular kind of "facts or data in forming an opinion on the subject," the facts or data "need not be admissible for the opinion to be admitted"). Here, Dr. De La Cruz's disclosure lists several sources of information for Dr. De La

Cruz's knowledge of the victims' gang membership.  *See* Docket No. 104 at 9.  The government does not challenge the reliability of these sources of information.

The government argues that Dr. De La Cruz is "simply seeking to 'parrot' secondary hearsay from the discovery that would be otherwise inadmissible."  Docket No. 110 at 7 (citing *United States v. Pablo*, 696 F.3d 1280, 1288 (10th Cir. 2012)).  The government's reliance on *Pablo*, however, is misplaced, as that case concerned the government's creating an "end run around" defendants' confrontation rights.  *See Pablo*, 696 F.3d at 1288 (quoting *United States v. Johnson*, 587 F.3d 625, 635 (4th Cir. 2009)).  Those concerns are not present here because Dr. De La Cruz is Mr. Harris's witness and there are no Confrontation Clause concerns with Dr. De La Cruz testifying about the victims' gang affiliations.

The government also argues that testimony about the victims' Aryan Brotherhood affiliation is irrelevant unless the Court "determines that [Mr.] Harris has a valid self-defense claim that was based on [the victims'] purported gang membership . . . *and* that purported gang membership caused him to strike."  Docket No. 110 at 7; *see also id.* at 5 (citing *United States v. Thomas*, 752 F. App'x 606, 609 (10th Cir. 2018) (unpublished) (discussing when defendant is entitled to a self-defense instruction)).  The government, however, fails to demonstrate that the defendant must make such a showing at this time.  A defendant is entitled to an instruction "on any recognized defense for which there is evidence sufficient for a reasonable jury to find in his favor."  *Toledo*, 739 F.3d at 567–68 (discussing sufficiency of evidence for self-defense instruction and noting "a defendant is entitled to an instruction if the evidence viewed in his favor could support the defense"); *United States v. Butler*, 485 F.3d 569, 571 (10th Cir. 2007) ("If supported

by the evidence and the law, a criminal defendant is entitled to jury instructions concerning his theory of defense.").  "A defendant's burden of production to warrant a self-defense instruction is not onerous."  *United States v. Barrett*, 797 F.3d 1207, 1218 (10th Cir. 2015) (quotations omitted).

A defendant, however, may not "present an affirmative defense that lacks any evidentiary support."  *United States v. Dodge*, 2018 WL 3352965, at *2 (D.N.M. July 9, 2018) (citing *United States v. Fraser*, 647 F.3d 1242, 1245 (10th Cir. 2011) ("No one, after all, has a right under the Constitution or at common law to present evidence that is insufficient as a matter of law to establish any recognized defenses.").  There may be a circumstance where a defendant "must make a threshold showing on the elements of an affirmative defense prior to the presentation of the evidence to the jury," *id.*, at *1 (citing *United States v. Bailey*, 444 U.S. 394, 412–15 (1980)), and, if such a threshold showing is insufficient, a "district judge [may] properly exercise [his] gate-keeping responsibilities by precluding" a defense.  *United States v. Portillo-Vega*, 478 F.3d 1194, 1197 (10th Cir. 2007) (granting motion *in limine* precluding duress defense after evidentiary hearing, noting that, "if the evidence is insufficient on even one element, 'the trial court and jury need not be burdened with testimony supporting other elements of the defense'" (quoting *Bailey*, 444 U.S. at 416)).

In his response, Mr. Harris notes several ways in which gang membership could be relevant.  For instance, it may rebut testimony by Ms. Kelley, Docket No. 123 at 8, it may be necessary in order to cross-examine the victims, *id.* at 9–10, or it may inform Mr. Harris's motive in defending himself.  *Id.* at 10.  In regard to self-defense, Mr. Harris responds to the government's motion by noting sensitivity to disclosing "too many

specific details about the trial defense." *Id.* The Court does not find it appropriate, under the circumstances, to require that Mr. Harris make a pretrial evidentiary showing or proffer regarding his motive during the assault since it may disclose whether or not he chooses to testify. Thus, the Court rejects the government's argument that Dr. De La Cruz cannot testify regarding the victims' gang membership unless the defendant shows before trial that the victims' gang membership motivated the defendant to assault the victims. Thus, at this stage, the Court cannot rule on the relevance of testimony that the victims are or were members of the Aryan Brotherhood because the relevance depends on other trial testimony.

### C.  Testimony about the History, Structure, and Practices of the Aryan Brotherhood

The government seeks to preclude Dr. De La Cruz from testifying about the history and structure of the Aryan Brotherhood. Docket No. 110 at 8–10. The government argues that Dr. De La Cruz is not qualified to testify about the Aryan Brotherhood in federal prisons because his experience is limited to his time being incarcerated in California prisons. *Id.*

As the Court noted at the January 13 hearing, the government does not dispute Dr. De La Cruz's experience in California prisons, which the Court found to be substantial. The Court also noted at the hearing that, although there are different federal and state prison gangs, there are white supremacist gangs in both prisons, and the government has not shown that there is a difference in the behavior of the federal or state Aryan Brotherhood. Dr. De La Cruz's supplemental disclosure indicates his familiarity with the Aryan Brotherhood and other gangs, and Dr. De La Cruz says that

the Aryan Brotherhood behaves similarly in state and federal prisons.  *See* Docket No.
104 at 7–10.

Again, citing *Pablo*, the government argues that Dr. De La Cruz will only "repeat
hearsay" from what other non-Aryan Brotherhood prisoners have told him about the
Aryan Brotherhood.  Docket No. 110 at 9–10.  *Pablo* is distinguishable for the reasons
discussed previously.  There are no Confrontation Clause concerns with Mr. Harris's
witness testifying about his knowledge and experience involving the Aryan Brotherhood,
its history, and its structure.  Nor does the Court find that the probative value is
substantially outweighed by the potential prejudice of this testimony under Rule 403.
Moreover, the government is not correct that Dr. De La Cruz will simply "parrot" or
"repeat" hearsay from non-Aryan Brotherhood members.  Part of Dr. De La Cruz's
knowledge about prison gangs comes from prisoners he has spoken to, *see* Docket No.
104 at 9–10, but his knowledge about the Aryan Brotherhood is also based on other
information and experience.

The disclosure regarding Dr. De La Cruz indicates that he will testify about
certain practices of Aryan Brotherhood members, such as that they "always walk in
groups whenever possible in order to avoid attacks . . . and to ensure that attacks they
commit are successful," or that they members "need to follow orders," which can include
"orders to assault or kill members of different races."  Docket No. 104 at 10.  Mr. Harris
has not shown, however, a sufficient connection between Dr. De La Cruz's opinions
regarding the behavior of Aryan Brotherhood members and the evidence in the case,
which makes the testimony irrelevant.  *See Bitler v. A.O. Smith Corp.*, 400 F.3d 1227,
1234 (10th Cir. 2005) ("Relevant evidence 'means evidence having any tendency to

make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'"  The "consideration of relevant evidence [i]s one of 'fit.'") (citation omitted).  For instance, the videos do not depict the victims walking in a group, and the De La Cruz disclosure does not refer to any evidence that the victims received an order from an Aryan Brotherhood leader to attack Mr. Harris or Mr. Wilson.  Moreover, Dr. De La Cruz's opinion that Aryan Brotherhood members may assault people without orders, *see* Docket No. 104 at 10 ("Dr. De La Cruz will also provide testimony and opine that [Aryan Brotherhood] members may also assault members of different races such as African Americans even without an order from leadership for a variety of reasons, none of which may appear rational to an outside observer."), is so broad as to be speculative and irrelevant.  *See Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003) (expert testimony may not be based on "subjective belief or unsupported speculation") (citation omitted).  Mr. Harris has provided no support for the proposition that a defendant may preemptively assault an Aryan Brotherhood member under the justification of self-defense because Aryan Brotherhood members may assault members of different races for a variety of reasons.  Thus, these opinions will be excluded under Rule 702.

### D.  Testimony about the Victims' Actions and Intentions

The government finally seeks to preclude Dr. De La Cruz from testifying about the victims' actions and intentions.  Docket No. 110 at 10–12.  The government argues that, because the videos "clearly demonstrate[] that the attack was committed" by Mr. Harris and Mr. Wilson, Dr. De La Cruz should not be able to testify that the victims' actions outside of the cell are consistent with "how [Aryan Brotherhood] members act as

lookouts," what "transpired before and during the incident," why "prisoners have weapons at their disposal," and how Aryan Brotherhood "members act to defend other [] members or participate in a fight." *Id.* at 10.  Relatedly, the government seeks to limit Dr. De La Cruz from testifying about "what transpired before and during the incident as shown in the video[s]." *Id.* at 11 (citing Docket No. 104 at 11).

Dr. De La Cruz may not testify that the victims' behavior, as captured on videos, is or is not consistent with his opinions about the behavior of Aryan Brotherhood members.  As the Court explained previously, Dr. De La Cruz may not "narrate" the videos.  Nor may he testify about what occurred between Mr. Harris, Mr. Wilson, and the victims before the time of the videos, which is not referenced in the disclosure.

The Court will also prohibit Dr. De La Cruz from testifying that the actions of the victims "is clearly evident of this behavior."  Docket No. 104 at 10–11.  Dr. De La Cruz does not explain what "this behavior" means, but Dr. De La Cruz presumably believes that the victims' behavior is indicative of typical Aryan Brotherhood behavior.  Dr. De La Cruz identifies certain types of Aryan Brotherhood behavior, such as walking in groups and following orders, and then claims that Mr. Hicklin's being "posted outside the cell" before the other victim "enters into the cell" is "consistent with how [Aryan Brotherhood] members act as lookouts for fellow [Aryan Brotherhood] members." *Id.* at 11.  The disclosure, however, provides no facts supporting this opinion and no explanation for why there was a need for a lookout.  Moreover, the disclosure does not explain or account for Mr. Harris and Mr. Martin entering the victims' cell without incident, the "lookout" being oblivious to Mr. Wilson entering the cell and pulling out a weapon, and Mr. Hicklin only reacting, presumably due to noise, after Mr. Wilson enters the cell.  In

other words, the disclosure regarding Dr. De La Cruz's opinions regarding the actions of the victims does not identify the bases and reasons for these opinions, Fed. R. Crim. P. 16(b)(1)(C), and does not demonstrate an application of expertise regarding gang behavior that fits the images on the videos.

## II.  DOCKET NO. 111

The government has filed a disclosure of the opinions of Amy Kelley, a designated expert witnesses.  Docket No. 103.  Mr. Harris seeks to exclude some of Ms. Kelley's opinions.  Docket No. 111.  The government opposes this motion.  Docket No. 122.

### A.  Testimony on "Shanks"

First, the government states that Ms. Kelley is expected to testify on what shanks are and how they are made.  Docket No. 103 at 4.  Mr. Harris does not object to Ms. Kelley's testimony on the general use of shanks, how they are made, and that the two weapons used in this case were shanks prohibited by the Bureau of Prisons.  Docket No. 111 at 6.

Second, the government states that Ms. Kelley will testify that "the metal shank used by [Mr.] Wilson was sharpened metal with a curvature at the top, a cloth around the handle, and a string used as a lanyard" and that the "metal shank used by [Mr.] Harris was in the sharpened form of a metal 'pick' that also has a white cloth or covering on the handle that is difficult to identify due to it being covered in dried blood." Docket No. 103 at 5.  Mr. Harris argues that, although Ms. Kelley may be able to "describe the weapons, she should be precluded from testifying as to attribution or who used which weapon."  Docket No. 111 at 7.  The Court agrees with Mr. Harris.  Federal

Rule of Evidence 702(b) requires an expert witness's testimony to be "based on sufficient facts or data."  The government's disclosure of Ms. Kelley, however, provides no basis for her opinion about who possessed which shank.  *See* Docket No. 103.  The Court will accordingly prohibit Ms. Kelley from expressing such an opinion since the disclosure provides no basis for her opinion.  *See* Fed. R. Crim. P. 16(a)(1)(G) (expert summary must contain, among other things, "the bases and reasons for those opinions").  The fact that other evidence at trial may establish who possessed which shank does not provide any basis for the government to effectively supplement Ms. Kelley's Rule 16 disclosures at trial.

Third, the government states that Ms. Kelley will testify that "both weapons were capable of causing serious bodily injury or death."  Docket No. 103 at 5.  Mr. Harris argues that Ms. Kelley's disclosure does not indicate that she has the expertise or qualifications to "render the medical opinions that are required" for this opinion.  Docket No. 111 at 7.  Although the Court agrees with Mr. Harris that Ms. Kelley's disclosure does not indicate any medical training that could qualify her to opine about the specific injuries a particular shank is capable of causing, the disclosure states that she has "viewed and investigated over 100 prison fights where shanks were used."  Docket No. 103 at 4.  Because Ms. Kelley is familiar with injuries shanks are capable of causing, she may opine in general terms about the types of injuries that shanks like the ones used in this attack cause.

## B.  Testimony on the Nature of Prison Attacks and the Attack in this Case

The government states that Ms. Kelley will testify that, based on her experience, "there is a distinct difference between prison attacks that are intended to cause injury

versus [to] kill" and that this distinction is "directly related to the weapon used and behavior of the attacking inmate when correctional officers intervene."  Docket No. 103 at 5.

First, the government states that Ms. Kelley will "explain that the use of shanks is indicative of an attack intended to cause serious bodily injury or death, as opposed to an attack without the use of shanks."  *Id.* at 5.  Second, the government states that Ms. Kelley will explain that, "based on her experience, prison fights at a secure facility . . . often result in immediate correctional officer intervention."  *Id.*  The government states that Ms. Kelley will testify that, in attacks intended to "wound or injure, the attacker will typically lay his weapon down when ordered," while in attacks intended to kill, inmates will "continu[e] the attack even after such intervention.  *Id.* at 5–6.  Third, the government states that Ms. Kelley "will opine that the co[-]defendants continued their violent attack with the use of shanks after officer intervention," which "indicates" that Mr. Wilson and Mr. Harris "intended to kill their victims rather [than] wound them."  *Id.* at 6.

Mr. Harris challenges each of these three opinions, Docket No. 111 at 8–11, arguing, in part, that Ms. Kelley has not provided the methodology or basis for her opinions.  *Id.* at 10.  To the extent Ms. Kelley will opine about prison attacks or fights generally, without narrating the videos, the Court disagrees.  Ms. Kelley has viewed and investigated over 100 prison fights where shanks were used.  Docket No. 103 at 4. That experience qualifies Ms. Kelley to render an opinion about the features of prison fights where the assailant's purpose is to injure versus those fights where the purpose is to kill.  The Court, however, will exclude any narration by Ms. Kelley of the actions of the persons on the videos or opinions by Ms. Kelley about what the persons shown in the

videos are doing or thinking.  As discussed with respect to Dr. De La Cruz, Rule 704(b) prohibits an expert from testifying that a defendant did or did not have a "mental state or condition that constitutes an element of the crime charged or of a defense."  The government has not demonstrated that, after Ms. Kelley testifies about the features of prison fights, the jury would not be able to understand the actions of the persons on the videos without her explanation of the videos.

Fourth, the government states that Ms. Kelley will testify that, in her experience, "victims of prison attacks rarely cooperate with law enforcement because cooperation with law enforcement is frowned upon by other inmates."  Docket No. 103 at 6.  Mr. Harris seeks to exclude this opinion, arguing that Ms. Kelley does not provide a basis for this opinion that applies to the individuals in this case.  Docket No. 111 at 11. Although the Court finds Ms. Kelley to be qualified to opine on the behavior of prisoner victims of prison attacks, the government has not connected this opinion to the facts of the case.  The government's disclosure regarding Ms. Kelley does not indicate whether either of the victims in this attack cooperated or refused to cooperate.  In response, the government states that the testimony is relevant "to provide context to the jury as to why the victims refused to cooperate with law enforcement and, presumably, refuse to testify at trial."  Docket No. 122 at 6.  If the victims refuse to testify at trial or refuse to answer questions about the assaults after taking the witness stand, Ms. Kelley's opinions, based on her experience reviewing and investigating prison attacks, may become relevant.  However, if the government does not call the victims as witnesses, but rather

Mr. Harris does, such testimony would be in the nature of rebuttal testimony.[5]

Testimony from Ms. Kelley regarding any refusal by the victims to cooperate in the

investigation may become relevant if Mr. Harris opens the door to the victims' lack of

cooperation.

### C.  Potential Rebuttal Testimony on Gang Membership and Self-Defense

The government states that, although it does not intend to offer evidence of Mr.

Harris's or Mr. Wilson's gang membership, Docket No. 103 at 6, if Mr. Harris is "allowed

to offer testimony, expert or otherwise" of the victims' gang membership, the

government "reserves the right to present expert testimony of Ms. Kelley" of Mr. Harris's

and Mr. Wilson's membership "as a potential motive for the attack in this case."  Docket

No. 103 at 6.[6]  Mr. Harris seeks to exclude this testimony because the disclosure for Ms.

Kelley provides no basis for the relevancy Mr. Wilson's gang membership, how Ms.

Kelley could know about the "motive" of the attack, or why she has expertise to opine on

motives.  Docket No. 111 at 12–13.  Although the Court agrees that Ms. Kelley cannot

opine on Mr. Harris's, Mr. Wilson's, or the victims' motives or mental states, *see* Fed. R.

Evid. 704(b), her experience investigating prison attacks qualifies her to opine on

motives, behavior, and characteristics of prison attacks generally.  Moreover, depending

on Mr. Harris's evidence at trial, it may be appropriate for Ms. Kelley to testify in rebuttal

---

[5] At the January 13 hearing, Mr. Harris's attorney indicated that he has a good faith belief that both victims are willing to testify.

[6] The government states that it intends to file a motion *in limine* to argue that discussion of the co-defendants' and victims' gang membership should be barred under Federal Rules of Evidence 401 and 403.  *Id.*  The government did not file such a motion before the deadline.  The only motions *in limine* the government has filed concern Dr. De La Cruz, *see* Docket No. 110, and the enhanced defense videos.  Docket No. 112. The government has not filed a motion *in limine* to bar all gang-membership testimony.

about Mr. Harris's and Mr. Wilson's gang membership.

Finally, the government states that it "reserves the right to call Ms. Kelley in rebuttal" if Mr. Harris "offers testimony, expert or otherwise, that [Mr.] Wilson and/or [Mr.] Harris acted in self-defense."  Docket No. 103 at 6.  The government states that "it is anticipated that Ms. Kelley will testify, in her experience, [that] the victims in this case reacted in a surprised and unprepared manner that is not consistent with a planned contemporaneous attack against the defendants."  *Id.* at 6–7.  As the Court has explained, Ms. Kelley may testify about the typical features of prison attacks, but it is for the jury to apply opinions regarding prison fights to the facts of this case.  Ms. Kelley may not offer her opinions of the victims' behavior, whether as indicative of a surprise attack or as indicative of something else.

## III.  DOCKET NO. 112

Mr. Harris's expert Steven Kuzma has enhanced the videos of the attack.  *See* Docket No. 104 at 12–15; Docket No. 108 at 1–5.  Mr. Harris provided these videos to the government and also provided information regarding the techniques that Mr. Kuzma used to enhance the videos.  *See* Docket No. 104 at 12–15; Docket No. 108 at 2–5.

The government has filed a motion *in limine* to exclude the enhanced videos. *See generally* Docket No. 112.  The government does not challenge Mr. Kuzma's expertise or his credentials.  *Id.* at 3.  The government, however, argues that the enhanced videos should be excluded from the trial under Rule 403 because they "distort[] the original videos, and, at times, grossly minimize[] the defendant's role in the attack."  *Id.* at 1–2.  The government argues that one enhanced video "even excludes the defendant from the screen as he is stabbing a victim" and "deletes the defendant

and one officer from the video." *Id.* The government provides side-by-side comparisons of specific frames of the enhanced videos that it finds objectionable. *See id.* at 4–9. Mr. Harris argues that the government's arguments go to the weight of the enhanced videos, not their admissibility. Docket No. 124 at 3.

Rule 403 states that the Court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." The Court does not find that the enhanced videos are inadmissible under Rule 401 or 403. The government argues that the enhanced videos lack probative value in light of the original videos, which the government believes more accurately depict the events in this case, and that the enhanced videos could be misleading or confusing to the jury, which would have to "choose which video to believe to be accurate." *See* Docket No. 112 at 10. The risk of unfair prejudice from the enhanced videos does not substantially outweigh the probative value. First, the jury will be able to compare the original videos to the enhanced videos to determine which are more reliable. The government fails to identify why the jury will be unable to make such a comparison. Second, the fact that some portions of the videos are enhanced and some are not does not make them unduly prejudicial. Any unfairness or bias displayed in such enhancements can be identified by the government in cross-examination and argument. Once again, the government fails to identify any basis of the jury being confused by the enhancement process given that the jury will be able to compare the enhanced videos to the original videos. Accordingly, the Court will deny the motion *in limine*.

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that the Government's Motion in Limine to Exclude Testimony of Dr. Jesse De La Cruz [Docket No. 110] is **GRANTED in part** and **DENIED in part**.  It is further

**ORDERED** that Defendant's Motion in Limine Regarding Government's Proposed Expert Amy Kelley [Docket No. 111] is **GRANTED in part** and **DENIED in part**.  It is further

**ORDERED** that the Government's Motion in Limine to Exclude Enhanced Defense Videos at Trial [Docket No. 112] is **DENIED**.

May 24, 2022.

BY THE COURT:

s/ Philip A. Brimmer
PHILIP A. BRIMMER
Chief United States District Judge